IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LILLY SAENZ, | § | |
|       Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | C.A. NO. C-05-288 |
| JO ANNE B. BARNHART, | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
|       Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Lilly Saenz, brought this action seeking review of the Commissioner's final decision that plaintiff is not disabled, and therefore, is not entitled to receive disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. (D.E. 1). She moves the Court to reverse the decision of the Commissioner, and enter a finding that plaintiff is disabled for purposes of DIB. (D.E. 15, at 7). Defendant moves the Court to affirm the Commissioner's decision and dismiss plaintiff's complaint. (D.E. 18, at 13).

For the reasons stated herein, it is respectfully recommended that plaintiff's motion for summary judgment be granted, and that the case be remanded to the Commissioner to hold a new administrative hearing. It is further respectfully recommended that the defendant's motion for summary judgment be denied.

## I. JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff filed her disability application on September 28, 1998, claiming an inability to work since February 1, 1996, due to fibromyalgia.[1]  Tr. 74, 84.  She alleged that this condition caused her to suffer pain that had "intensified to a debilitating state which is almost always present."  Tr. 84.  Her disability application was initially denied on February 3, 1999, Tr. 32-36, and then denied on reconsideration.  Tr. 49-52.  She then requested a hearing by an Administrative Law Judge ("ALJ").  Tr. 53.

On March 17, 2003, the ALJ held an administrative hearing in Corpus Christi, Texas.  Tr. 384.  During the hearing, he ordered that plaintiff undergo a psychiatric evaluation.  Tr. 398.  On October 22, 2003, the ALJ held a second administrative hearing in this case.  Tr. 372.  In an April 12, 2004 decision, he found that plaintiff was not disabled, and therefore, was not entitled to either DIB benefits.  Tr. 18.  He identified plaintiff's severe impairments as fibromyalgia, vertigo, fatigue, and memory problems.  Tr. 27.  However, he found that plaintiff failed to establish that

---

[1] Fibromyalgia is medically defined as "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points."  Dorland's Illustrated Medical Dictionary 673 (29th ed. 2000) [hereinafter Dorland's].

she was disabled at anytime as defined by the Social Security Act.  Tr. 28 (citing 20 C.F.R. § 404.1520(f)).  He held that plaintiff had the residual functional capacity ("RFC") to perform a significant range of sedentary work.  Tr. 27.  Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which was denied on July 12, 2004.  Tr. 4-9.

On June 8, 2005, plaintiff filed this action seeking review of the Commissioner's denial of benefits.  (D.E. 1).  She now moves the Court to reverse the decision of the Commissioner and grant her full benefits, both past and future. (D.E. 15).

Defendant filed a response to plaintiff's motion for summary judgment, in which she also moved for summary judgment.  (D.E. 17, 18).  The Commissioner states that "[b]y submitting this pleading, Defendant does not waive her contention that Plaintiff failed to properly serve the Agency with his original complaint."  Id. at 1.  Defendant moves the Court to affirm the ALJ's decision and dismiss plaintiff's complaint because substantial evidence and relevant legal standards support the ALJ's decision.  Id. at 13.

## III.  LEGAL STANDARDS

**A.    Social Security Act Disability Benefits Requirements.**

The Social Security Act establishes that every individual who is insured for DIB, has not attained the set retirement age, has filed an application for disability

benefits, and is under a disability is entitled to receive disability benefits.  42 U.S.C. § 423(a)(1).

Disability is defined as an "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence ... "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## B.    Social Security Administration Regulations And Rulings.

To determine if an individual suffers from a disability, the Commissioner has promulgated regulations containing a five-step sequential process to be used by the Social Security Administration.  20 C.F.R. § 404.1520 (2005).  A disability finding at any point in the five-step process is conclusive and ends the analysis.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990) (citation omitted).  A claimant bears

the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam). A claimant must prove that: (1) he is not presently engaged in substantial gainful activity; (2) he suffers from an impairment or impairments that are severe; and (3) the impairment meets or equals an impairment listed in the appendix to the regulations; or (4) due to claimant's RFC, the impairment prevents the claimant from doing past relevant work. 20 C.F.R. § 404.1520(a)(4); see also Bowling, 36 F.3d at 435; Villa, 895 F.2d at 1022.

The Fifth Circuit has held that "[t]he first two steps involve threshold determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). The Commissioner may find a claimant's impairment fails to meet the significant limitation requirement, "'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Id. at 391 (citing Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)).

Step three requires a claimant to prove that his impairment meets one or more of the impairments listed in the regulations, which includes both physical and

mental impairments.  See 20 C.F.R. § 404, Subpt. P, App. 1.  Mental impairments are listed in the appendix under Part A § 12.00, which specifies the criteria for determining the severity of a listed mental impairment.  20 C.F.R. § 404, Subpt. P, App. 1, Part A, § 12.00.  This criteria takes into account whether there is marked interference with activities of daily living, social functioning, concentration, persistence, or pace, and whether there are repeated episodes of decompensation.  Id. Part A § 12.00(A).  The regulation defines "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  Id. Part A § 12.00(C)(4).

Under the fourth step, a claimant who is unable to show that his impairment meets one of the listed impairments must show that he is unable to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The claimant's RFC is taken into consideration to determine whether claimant's impairments may cause physical and mental limitations that affect the ability to work.  20 C.F.R. § 404.1545.  The RFC is the most a claimant can do despite any limitations caused by an impairment.  Id. All relevant evidence in the record, including medical and non-medical evidence, is taken into consideration by the Commissioner when making a determination of a claimant's RFC.  Id.

6

The Commissioner must consider all of plaintiff's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and non-medical evidence in the record.  S.S.R. 96-7p, 1996 WL 374186.  "[T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  Id. at *2. When a claimant's statements concerning symptoms and their associated limitations "are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  Id.

In cases where "additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual statements."  Id. at *3 (emphasis added). Because an individual's "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the regulations set out factors that must be taken into consideration by the adjudicator concerning a claimant's symptoms, in addition to objective medical evidence.  20 C.F.R. § 404.1529(c)(3).  Among the factors considered are the following: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other

symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication taken for other symptoms; (5) treatment, other than medication, received for relief; (6) any measures used to relieve pain or other symptoms; and (7) any other factors concerning functional limitations and restrictions due to pain or other symptoms.  Id.

The adjudicator's discussion of a claimant's RFC must throughly discuss and analyze the objective medical and other evidence in relation to the symptoms. S.S.R. 96-8p, 1996 WL 374184, at *7.  This discussion must include a resolution of any inconsistencies in the record, address a logical explanation of effects of the alleged symptoms on the individual's ability to work, contain a determination of why symptom-related functional limitations can or cannot be reasonably accepted as consistent with medical or non-medical evidence, and address any medical opinions contained in the record.  Id.

If the claimant is able to meet his burden under the first four elements, the burden shifts to the Commissioner.  The fifth step requires the Commissioner to determine, based on the claimant's RFC, age, education, and work experience, if the claimant can make an adjustment to other work that exists in significant numbers in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The Commissioner will find that the claimant is disabled if the claimant cannot make an adjustment to other work.  Id.

**C.    Judicial Review.**

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000) (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); accord Carey, 230 F.3d at 135.  The Fifth Circuit has described this burden as more than a scintilla, but lower than a preponderance. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "'no substantial evidence'" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam) (citation omitted).

If the Commissioner's findings are supported by substantial evidence, the Court must defer to the Commissioner, and affirm the findings.  See Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002).  In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  The Court, however, does not reweigh the evidence, try the issues de novo, or substitute its judgment for that of the Commissioner.  Id.; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).  Factual conflicts that

exist in the record are for the Commissioner and not the Court to resolve.

Masterson, 309 F.3d at 272.

It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him; and (4) the claimant's age, education and work history.  Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam) (citation omitted).

## IV.  ADMINISTRATIVE RECORD

### A.    Plaintiff's Impairments.

The ALJ found that the medical evidence in plaintiff's case indicated that she suffered from fibromyalgia, vertigo, fatigue, and memory problems.  Tr. 22.

On July 17, 1995, plaintiff was seen by Doctor Frank Morgan, and received as a new patient consultation.  Tr. 184.  She had been referred to Dr. Morgan due to her recurring pruritus,[2] fibromyalgia, general body aches, and severe fatigue over a several year period.  Id.  Dr. Morgan performed a physical examination that revealed she had a "fibromyalgic tender point pattern about the back neck, thoracic and lumbar spine, anterior lateral shoulders, sternal ridge, lateral hips and medial legs.  The hamstrings and low back are quite spastic and tight."  Tr. 185.  His

---

[2] Pruritus is defined as "an unpleasant cutaneous sensation that provokes the desire to rub or scratch the skin to obtain relief."  Dorland's supra n.1, at 1480.

impression was that plaintiff suffered from fibromyalgia, mild degenerative arthritis, and pruritus. Tr. 186. He prescribed her Prozac and Relafen.[3] Id. His notes indicate that the Relafen would be prescribed for a period of ten days, at the end of which the goal was to wean her off this medication and substitute it with Tylenol. Id. Shortly after her initial visit, she underwent some diagnostic testing. Tr. 187-90.

Plaintiff did not return to see Dr. Morgan until one year later. Tr. 167. She complained of general body aches and fatigue, swelling of her hands, and morning stiffness. Id. She further complained that she was having problems getting around, and caring for herself. Id. His impression was that she suffered from fibromyalgia and moderate degenerative arthritis. Tr. 168. His notes indicate that she was taking several medications, but had stopped taking the Prozac and Relafen approximately one month after her initial visit. Tr. 167. Dr. Morgan recommended several tests be performed, including x-rays of her hands, a bone densitometry, and urinalysis. Tr. 168. He further recommended that she begin seeing a physical therapist, and prescribed Prozac, calcium supplements, Lodine,[4] and Pepcid AC. Id.

On September 9, 1996, she returned to see Dr. Morgan for a follow-up visit.

_____

[3] Relafen is a trademark name for nabumetone. Dorland's, supra n.1, at 1555. Nabumetone is defined as "a nonsteriodal anti-inflammatory drug used in the treatment of osteoarthritis and rheumatoid arthritis; administered orally." Id. at 1175.

[4] Lodine is a trademark name for preparations of etodolac. Dorland's, supra n.1, at 1026. Etodolac is defined as "a nonsteriodal anti-inflammatory drug prescribed as an analgesic and anti-inflammatory, especially to treat arthritis; administered orally." Id. at 626.

Tr. 166.  His notes indicate that she continued to suffer from fibromyalgia, and not inflammatory arthritis.  Id.  He stated that x-rays revealed degenerative changes in her hands, and that the bone densitometry showed osteopenia.  Id.  His impression was that plaintiff suffered from fibromyalgia, gastritis, and auto-immune thyroid disease.  Id.  He also recommended some more tests and a follow-up visit in six weeks.  Id.  Additionally, he recommended that she continue taking the Lodine.  Id.

On August 18, 1997, plaintiff returned to see Dr. Morgan.  Tr. 161.  He had not seen her since her visit in September of 1996.  Id.  She complained of increased pain, and increased disablement due to her fibromyalgia.  Id.  She further complained of decreased sleep due to pain, increased morning fatigue, increased right knee pain, increased acid reflux, and slight depression.  Id.  She also indicated that Dr. Randy Fuentes had performed an EKG on her in April or May of that year. Id.  Dr. Morgan's notes indicate that the examination results were normal except for positive Tinel's sign[5] at the left wrist.  Id.  His impression was that she continued to suffer from fibromyalgia, degenerative arthritis, and gastritis.  Tr. 165.  Dr. Morgan recommended some additional tests be performed.  Id.  He further recommended that she take Tylenol and Motrin for her pain, and once again prescribed her Prozac.  Id.  He noted that she would be out of town, and that an attempt would be

---

[5] Tinel's sign is defined as "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  Dorland's, supra n.1, at 1644.

made to see her again in four weeks.  Id.

One year later, plaintiff returned to see Dr. Morgan.  Tr. 162.  She complained of increasing general body aches, and specifically complained about increasing pain in her right shoulder.  Id.  She claimed that she had trouble getting around and sleeping.  Id.  She felt that her fatigue was increasing and that she was becoming more disabled.  Id.  The exam revealed that deep tendon reflexes were intact, positive Tinel's sign at both wrists, no thenar atrophy or grip strength loss, general tender points present, right shoulder was partially frozen and tender laterally, and no joint swelling.  Id.  His impression was mild degenerative arthritis, fibromyalgia, and chronic right shoulder bursitis.  Tr. 163.  He recommended that she wrap her wrists at night for her Carpal Tunnel Syndrome, wear a collar at night for neck spasms, and use Tums as a calcium supplement.  Id.  He prescribed her Zoloft for her fibromyalgia, and injected her right shoulder with Aristospan.[6]  Id.  He recommended some additional testing and a follow-up visit in three weeks.  Id.

On November 3, 1998, Dr. Morgan saw plaintiff for a follow-up visit.  Tr. 161.  She claimed that she was unable to do any exercise due to her pain, and was taking Motrin and Tylenol for pain relief.  Id.  She further claimed that the Zoloft was not helping with her fatigue, or restfulness.  Id.  Dr. Morgan noted that her

---

[6]  Aristopan is a trademark for a preparation of triamcinolone hexacetonide.  Dorland's, supra n.1, at 129.  Triamcinolone hexacetonide is "used as an anti-inflammatory and immunosuppressant in a wide variety of disorders."  Id. at 1871.

bone densitometry showed osteopenia in her lower back.  His impression was degenerative arthritis, fibromyalgia, and hypothyroidism.  Id.  He recommended that she stop taking Aleve and any other over the counter nonsteriodals, and prescribed her Disalcid.[7]  Id.

Plaintiff was also seen by Doctor Paul St. Amand for her fibromyalgia.  The record indicates that she visited his office four times between April 1998 to August 1998.  Tr. 158.  During her initial visit with Dr. St. Amand, she complained of general aches and pains, fatigue, depression, insomnia, and memory problems.  Tr. 159.  Dr. St. Amand's impression was that she suffered from fibromyalgia.  Id.  He prescribed guaifenesin[8] for her fibromyalgia.  Id.

Plaintiff also received treatment from Dr. Fuentes during this time period, from April 1996 to December 1998.  Tr. 239-55.  His notes also indicate that she complained of pains and symptoms related to her fibromyalgia.  Id.

At the first administrative hearing, held on March 17, 2003, the ALJ told plaintiff that she had the "classical symptoms of depression but [was] [] in denial." Tr. 398.  He ordered that she undergo a psychiatric evaluation.  Id.  Doctor Sharon Rogers, a licensed psychologist, examined plaintiff, and provided the ALJ with a

---

[7] Disalcid is a trademark for a preparations of salsalate.  Dorland's, supra n.1, at 509. Salsalate is defined as "the salicylate ester of salicylic acid, which hydrolyzes in vivo to form salicylate; used for treatment of osteoarthritis and rheumatoid arthritis; administered orally."  Id. at 1596.

[8] Guaifenesin is used as "an expectorant, administered orally."  Dorland's, supra n.1, at 774.

report that included her findings concerning plaintiff's mental status and functional abilities.  Tr. 262-68.

In her report, Dr. Rogers indicated that plaintiff's medications included "Synthroid, Norvasc, Mobic for inflammation and pain, Effexor for fibromyalgia, Zanaflex for muscle tension, Pamelor to help her sleep, Nexium for acid reflux and Singular, Zyrtec and Ventolin inhaler for allergies and asthma." Tr. 263.  Plaintiff indicated to Dr. Rogers that this was the first combination of drugs that had eased her constant pain.  Id.

Dr. Rogers' impression was that plaintiff had a pain disorder associated with psychological factors and a general chronic medical condition.  Tr. 266.  She found that plaintiff suffered from chronic physical pain.  Id.  She stated that plaintiff's Global Assessment of Function was 50.  Id.  She further stated that:

> Prognosis is guarded given Ms. Saenz' diagnosis of fibromyalgia and arthritis and associated physical pain contributing to decreased social activities and compromising her overall functioning.  Ms. Saenz [sic] condition during the last five years has been treated with multiple prescribed medications offering only minimal relief.

Id.

Dr. Rogers also provided the ALJ with a medical assessment of plaintiff's ability to do work-related activities.  Tr. 267-68.  In this assessment, she stated that "claimant is verbally interactive but her ability to sustain social interactions and to function independently is compromised by chronic pain associated with

fibromyalgia." Tr. 267.  She further stated that "claimant does not demonstrate or report memory problems but her ability to carry out tasks is limited by physical functioning." Tr. 268.  Regarding plaintiff's ability to make occupational adjustments, Dr. Rogers indicated that plaintiff's functional ability in many areas was seriously limited but not precluded, and in one instance that her functional ability was almost absent.  Tr. 267.

On October 22, 2003, the ALJ held a second administrative hearing.  Tr. 372-83.  At this hearing, testimony was taken from plaintiff and Agnes Gerner, a vocational expert.  Id.  The ALJ questioned Ms. Gerner as to whether an individual limited to sedentary work could perform plaintiff's past relevant work.  Tr. 377-78.  Ms. Gerner stated that plaintiff appeared to possess "transferable skills to [a] sedentary, [] less demanding job."  Tr.  379.  She provided the ALJ with examples of jobs that plaintiff could perform, which included school attendance clerk, food stamps clerk, and various other clerical positions.  Tr. 379-80.

Plaintiff was represented by Homer R. Gonzalez, a non-attorney, at the second hearing.  Tr. 375.  Mr. Gonzalez asked Ms. Gerner whether an individual that was precluded from the use of her hands, could perform the clerical positions previously discussed.  Tr. 382.  Ms. Gerner stated that an individual with those limitations would not be able to perform the clerical occupations.  Id.  Mr. Gonzalez further questioned Ms. Gerner as to whether an individual with carpal tunnel, who

was unable to use her hands, would be able to perform a clerical job.  Id.  Ms. Gerner stated that this individual would not be able to perform clerical work.  Tr. 383.

The ALJ determined that plaintiff's impairments were severe, "but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4."  Tr. 22.

**B.    Residual Functional Capacity Assessment**.

The ALJ stated because plaintiff's impairments did not meet one of the impairments listed in the regulations, he would have to assess her RFC to perform her previous work, or other work that existed in significant numbers in the national economy.  Id.  The ALJ reviewed both the medical and non-medical evidence.  He found that plaintiff "retains the residual functional capacity to perform sedentary work with limitations.  She can perform simple repetitive work in a routine work environment.  She cannot perform work that involves fine fingering."  Tr. 24.

The ALJ claimed that, in arriving at this determination of plaintiff's RFC, he had considered plaintiff's allegations.  Id.  He stated that he did not find plaintiff's fibromyalgia to be as disabling as she claimed.  Id.  He further stated that plaintiff "may experience some of the subjective symptoms to which she testified but not to the degree alleged.  The claimant's testimony is an overstatement of her subjective

symptoms and functional limitations and is only generally credible." Id.  He found

that the objective medical evidence did not support the degree of pain and

functional limitations that the plaintiff alleged, and that her condition would be

expected to cause only mild pain.  Id.  He noted that there was no record of

hospitalization, or aggressive treatment protocols that would be indicative of

"severe, persistent, and unremitting pain."  Id.  He stated that plaintiff's medications

appeared to be effective and not cause any side effects.  Id.

Finally, the ALJ discussed plaintiff's ability to engage in her previous work,

or perform jobs that existed in significant numbers in the national economy.  Tr.

24-27.  He found, based on Ms. Gerner's testimony and plaintiff's RFC, that

plaintiff was unable to perform her previous relevant work.  Tr. 25.  The ALJ

recognized the burden was on the Social Security Administration to prove that there

were relevant jobs in the national economy that plaintiff could perform in light of

her RFC, capacity, age, education, and work experience.  Id.

Due to plaintiff's age, the ALJ stated that:

> The vocational issue becomes whether the claimant possesses
> "highly marketable" skills....  [T]he undersigned must consider a
> claimant's skills to be "highly marketable" only if the skills are
> sufficiently specialized and coveted by employers as to make the
> claimant's age irrelevant in the hiring process and enable that
> claimant to obtain employment with little difficulty.  In
> determining whether a claimant's skills meet this definition, the
> undersigned must consider: (1) whether the skills were acquired
> through specialized or extensive education, training, or
> experience; and (2) whether the skills give the claimant a

competitive edge over other, younger, potential employees with
whom the claimant would compete for jobs requiring those
skills.  Social Security Administrative Ruling 95-1(6).

Id.  He found that plaintiff's clerical skills were "highly marketable, acquired

through extensive training and experience, and g[a]ve the claimant a competitive

edge over other, younger, potential employees with whom the claimant would

compete for jobs requiring those skills."  Tr. 26.  He further found that plaintiff was

able to successfully adjust to sedentary work that existed in significant numbers in

the national economy.  Tr. 26-27.

## V.  DISCUSSION

Plaintiff argues that the ALJ abused his discretion, and that his decision is not

supported by substantial evidence.  (D.E. 15).  More specifically, plaintiff argues

that the ALJ abused his discretion in finding that her impairments did not meet a

listed impairment, and abused his discretion in holding that there are a significant

number of jobs in the national economy that accommodate her RFC and vocational

factors.  Id. at 3-5.

Social Security Regulations require the Commissioner to consider the

combined effect of a claimant's multiple impairments in making its determination

of whether the impairments are medically severe.  20 C.F.R. § 404.1523; Loza, 219

F.3d at 393.  The regulations further require that where the symptoms alleged

include pain, the RFC must throughly discuss and analyze the objective medical and

other evidence in relation to the symptoms.  See 20 C.F.R. § 404.1529(c)(3); see also S.S.R. 96-8p, 1996 WL 374184, at *7.

The undersigned magistrate judge is aware of the Court's limited function in reviewing the Commissioner's decision regarding disability benefits; however, "this Court is not a rubber stamp for the Secretary's decision and is not simply reviewing the record to find evidence to support the ALJ's decision."  Alejandro v. Barnhart, 291 F. Supp.2d 497, 500 (S.D. Tex. 2003) (citing Cook v. Heckler, 750 F.2d 391, 393 (5th Cir. 1985); Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986)). "Unlike the area of substantial evidence, the ALJ's legal determinations are not afforded the same deference."  Id.

Social Security rulings require that the ALJ "evaluate the intensity, persistence, and limiting effects" of plaintiff's symptom complaints.  See S.S.R. 96-7p, 1996 WL 374186 at * 2.  The Fifth Circuit has established that, while Social Security Administration rulings are not binding, they are "frequently relied upon ... in evaluating ALJ's decisions."  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam) (citations omitted).  If a plaintiff's symptoms are not founded in objective medical evidence, then the ALJ must make a credibility determination of plaintiff's complaints.  Id.  In making this determination, the ALJ must make every effort to obtain available information including taking into consideration evidence

concerning duration, frequency and intensity of symptoms, and type, dosage, effectiveness, and side effects of medication taken for symptoms.  See 20 C.F.R. § 404.1529(c)(3).

It is respectfully recommended that the ALJ did not make a sufficient effort to obtain detailed information concerning plaintiff's pain and alleged limitations, as well as their potential impact on her ability to work when making his determination of plaintiff's RFC.  At the hearing, plaintiff testified that she had low energy and suffered from constant pain.  Tr. 399.  She further testified that she had been diagnosed with fibromyalgia, and more recently she was diagnosed with lupus.  Id. She stated that an echogram had revealed pressure on the right side of her heart, and she had undergone a stress test, but had not yet received the test results.  Id. The ALJ's response was that "[a]ll of th[e]se things that you've told [me] about go hand in hand with depression."  Id.

Plaintiff told the ALJ that she does not know why she is disabled, and that she had been to numerous doctors in her life, and had never received satisfactory results.  Tr. 396.  She also explained to him that she suffered constant pain.  Tr. 397.  The ALJ did not question plaintiff concerning the duration, intensity, or frequency of her pain.  Moreover, there was no significant discussion concerning any of the thirteen medications that plaintiff claimed she was currently taking to

relieve her ailments.  He did, however, question her about the possibility that she

was depressed.  Id.  He told her that he believed she suffered from depression, and

that her physical ailments were attributable to depression.  Tr. 399.  He stated

"which comes first the egg or the chicken or whatever?...  I have a suspicion.  I may

be wrong, but we're going to find out."  Tr. 400.

Moreover, there was no testimony from a medical expert at either hearing

concerning plaintiff's physical impairments.  At the first hearing, the ALJ told

plaintiff that a medical expert would testify concerning her medical problems based

on the medical evidence that she had submitted.  Tr. 390.  While testimony of a

medical expert may not be required, it is useful to explain medical problems in

terms that are understandable to the ALJ, who is a layman.  See Richards v. Perales,

402 U.S. 389, 408 (1971).  The ALJ appears to have not been familiar with the

medical conditions that plaintiff alleged disabled her.  At the hearing, he asked the

plaintiff "[w]hat happened to you that you became disabled? ... you've got to tell

me a certain reason why you became disabled."  Tr. 396.  It is respectfully

recommended that he effectively disregarded the plaintiff's claim that she suffered

from physical medical conditions, and diagnosed her with depression during the

first administrative hearing.

In his decision, the ALJ found that plaintiff's allegations of pain, symptoms,

and limitations were not totally credible.  Tr. 24.  The ALJ cited the fact that there

was no indication of repeated hospitalizations, or aggressive treatment protocols,

and a lack of evidence that showed "serious muscle weakness, muscle spasm,

atrophy, weight loss, or other signs of progressive physical deterioration" as a basis

for finding that plaintiff's complaints were an overstatement of her symptoms and

functional limitations.  Id.  The Fifth Circuit has noted that "[a]lthough common

sense might dictate that a person who can play handball can hold down a job,

common sense about medical matters is often wrong."  Frank v. Barnhart, 326 F.3d

618, 622 (5th Cir. 2003) (per curiam).

Plaintiff provided numerous medical records from several doctors that were

treating her for pain associated with her fibromyalgia.  A claimant's treating

physician's opinions regarding the nature and severity of the patient's impairment

generally will be given controlling weight.  Newton v. Apfel, 209 F.3d 448, 455 (5th

Cir. 2000).  The ALJ did summarize the information contained in the medical

records that were submitted to him.  However, it is respectfully recommended that

the ALJ failed to consider the opinions of plaintiff's treating physicians.  Instead, he

summarily stated that her impairments failed to meet any of those listed in the

regulations, and that the objective medical evidence did not support her allegations.

Therefore, it is respectfully recommended that the Court find that the ALJ's

determination of plaintiff's RFC is not supported by substantial evidence in the record because the ALJ did not properly apply the applicable legal standards.

## VI. RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that plaintiff's motion for summary judgment be granted, and that the case be remanded to the Social Security Administration for a new administrative hearing.  It is further respectfully recommended that respondent's motion for summary judgment be denied.

Respectfully submitted this 19th day of December 2005.


_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 636(b)(1)(C), and Article IV, General Order No. 2001-6, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).